The audience is leaving. Our law clerks remain. I was wondering if a lot of them were. Yeah. I've been thinking of another case today. Yeah. Geraldine had to bring in 50 or so extra chairs for the one that they were doing yesterday in the other courtroom. Mr. Sheffy, you may proceed. Good morning. My name is Parker. I'm here as counsel for the respondent or appellant. Your name is what? Parker Sheffy. Okay. Okay. And so may it please the court, this case is one in which it pertains to an individual, Mr. Stephen Tendo. Mr. Stephen Tendo is a former civics teacher who turned Pentecostal pastor, and as a result of the civic-minded interests, founded a nonprofit called Eloy Ministries. And with respect to his position at Eloy Ministries, it was a nonprofit that served to educate the public as well as provide certain social services such as health care and educating the public. The following of this nonprofit gained upwards of 6 million people, and at first was in an agreement with the Ugandan government. However, following a tumultuous and adversarial presidential election in 2011, things turned south. The turning south caused the individual to receive numerous counts of abuse that one can really only seek to understand by virtue of, in my mind, Hollywood movies. Thereafter... The Cobra and all of that, and that python, what was it? Yes, ma'am. So that was within the first instance. So he had two fingers that were cut off by barbed wires. He was placed in a dark room with a python wrapped around its neck that apparently if you pull the python's neck by a rope, it causes the python to whip. Did the IJ not believe that these things happened? Because, I mean, didn't he hold out his fingers and show that his fingers had been cut off? Yes, ma'am. So as it relates to the credibility findings, so it's uncontroverted in the record that within the record, before the IJ, he held up his two fingers that were missing. And that was duly noted. The python was part of what was called VIP treatment for the purpose of not leaving any form of scar upon the individual being released from this captivity. But in addition to that, Mr. Tindo was shot in the leg, which left scarring, which was also brought before the IJ. Again, uncontroverted, as well as had hot plastic dripped on the bottoms of his feet, which also left a form of discoloration that was also duly noted by the IJ. You know, it's substantial evidence is a high standard, so that's a difficulty in this case. Is it your position that there's too many adverse credibility findings that are wrong? How do you get where you need to go? Yes, so substantial evidence is, of course, a high standard, but it's within the totality of the circumstances legal standard such that the adverse credibility finding should be upheld unless the totality of circumstances is such that no reasonable fact finder could continue to uphold such an adverse credibility finding. And so it's because of the totality of the circumstances, including the three instances that were just recounted that led to physical maladies or permanent scarring on Mr. Tindo's body, in addition to others that were well documented and uncontested within the record, that is part of the totality of the circumstances. So you believe that no reasonable fact finder could conclude that there was not persecution here? Correct. And that's your standard, is that right? So the totality of circumstances standard, yes, ma'am. That given all these things that did happen and that are physically apparent in the record, no reasonable fact finder could conclude otherwise, that he was persecuted? Correct. That's the problem with the case, is whether he was persecuted? So there's two issues. So the first is the adverse credibility finding below. And then the second is this case has a lengthy procedural history, and there was a subsequent motion to reopen that was filed. That his sister?  I'm sorry. Yes, ma'am. After the sister was attacked outside of her home within a couple days of the BIA order denying the initial appeal. So that motion to reopen was denied, and it was adjudicated according to an erroneous standard. So it would be the second issue in the case. So you guys are two independent grounds that you have. One is that no reasonable fact finder could have found, and also it should have, the reopen was denied inappropriately? Yes, ma'am. Do we have jurisdiction over the reopen? Yes. So there is jurisdiction over the motion to reopen because it's a final order. It's not discretionary of the kind that we often don't have jurisdiction over? So a sua sponte motion would be one in which there's pure discretion. But since it was moved for and there was a decision made, then we do have, then it's not purely discretionary and we can adjudicate that. Is that right? Precisely, because there was legal error. So the motion to reopen should have been adjudicated pursuant to the, so there's a time bar. Individuals upon the issuance of an order, a final order, have 90 days in which they are required to bring a motion to reopen. This particular motion to reopen was filed, I believe, 21 days after the entry of the BIA order, and was nevertheless held and adjudicated pursuant to a different standard, this being one that required an analysis of a changed country conditions exception. So the statute provides for if your motion to reopen is untimely, you're unable to bring a motion to reopen unless you can prove changed country conditions. However, that changed country conditions analysis is an opposite because it was a timely filed motion to reopen. Do you have other things that you want to argue about? Yes. So as it relates to that initial adverse credibility finding, so to the point of the totality of the circumstances and as we think to why no reasonable fact finder could find against the respondent in this case, there's both the lengthy history of abuse and uncontroverted evidence within the record in support of finding the persecution, and then those instances that the immigration judge upheld by the BIA and that the government's position are the foundation for the adverse credibility finding are either in error or not supported by the record otherwise. I'm sorry to go back to this because the motion to reopen, if we were to find, and this is not a foreshadowing, this is just a question, if we were to find that the motion to reopen was denied inappropriately, would we need to reach the substantial evidence question or would we leave that be because it would be going back for further proceedings? I'll ask the other side too. I don't know the answer. Yeah. I just contemplated that in preparation. Does the court need to adjudicate a standard as it relates to that substantial evidence? We have standard in our case law of what we use, so do we have to do anything with that or does that just carry along with the case back to the? I would say it's carried back to the case. So the standard being totality of the circumstances such that the evidence compels the reopening and so the re-adjudication or the remand back to the IJ would be one where the fact-finding could be redone in order to properly weigh all of that evidence. Okay. And for the reopening, you have a legal argument that it was improperly denied because the FSN standard was used when the FSN standard doesn't apply in this context because it's not changed country conditions, correct? Yes, ma'am. So the FSN is a board decision that seeks to provide the test for applying the changed country conditions exceptions to untimely filed motions to reopen. And so at the baseline, it was a timely filed motion to reopen, so therefore that is like the start and the stop. Right. So it was timely. It was timely. And that's the whole thing on this type of we don't do the FSN analysis here in this context? Correct. But the board proceeded to apply FSN incorrectly by deeming that this motion to reopen was one in which required such changed country conditions as an instance. Anything else? I didn't mean to distract you from your argument about substantial evidence or whatever you wish to use your time for. No problem. So, yeah, thank you. I appreciate the redirect. So as we're weighting this totality of the circumstances as it relates to the reasons that were found to be to detract from the totality of circumstances and to find the adverse credibility finding, one of which there were six bases that were listed. The first being that there's a discrepancy with the timeline. So in March of 2012, this was the first instance of persecution of the client, whereby he was collected at a gas station, taken, and this is where his fingers were cut off. The fingertips on, and this is where the Python instance happened. Within that, he was detained for upwards of three months, and one of the key witnesses being an individual who was a prison guard at this prison. One point of discrepancy is that this prison was described as a safe house, which is a euphemism of anything, which seems to be a place where there's this extrajudicial enforcement of horrific things, such as being whipped by a Python. So one of the reasons for the basis for the adverse credibility finding was that this letter was authored in June. However, June falls within that three-month time period from April to July. So there really is no discrepancy there. So they're wrong. So they're wrong. So we have a case that says if they're wrong about several things, then just being wrong about one thing is usually not enough, but if they're wrong about several things, that we send it back for that reason that are key towards the credibility finding. It's a recent case, and its name is escaping me right now. I'm not certain. Okay. Is it your position that they were wrong about several things that are just factually wrong, or is it just this one thing that's wrong? So there's two prongs, at least as it relates to this initial, to the role of the significant witness of this prison guard that provided this letter, and this letter was found to be wrong. There's another aspect to her. Her testimony was discounted as she was held out to be an interested witness, which is, one, there's no per se prohibition. So she was found to be an interesting witness because of a familiar relationship that she has with Mr. Tendo. And the case for ‑‑ Dr. Korolecki, or is that someone else? No, ma'am, it's Ms. Geraldine. Okay, Geraldine, the officer at the prison. Yes, ma'am. What is her relationship? So her relationship was, one, at the time that she was first encountered, the client he's attained in this safe house prison was one of just guard inmate. Subsequent to his release at a funeral, they reencountered one another and realized that they had this continual overlap of familial relationships, that they determined that they are cousins. However, the direct linkage or the extent to, like, how they are cousins has not been provided in the record. So are they first cousins? That's the part I don't know. But because she was held to be a family member, she was held to be an interested witness, and so therefore her testimony was given minimal weight, which there's two aspects to that. One, there's no per se prohibition against family members providing testimony. And then the second aspect is the case that's cited by the government as interested witnesses is distinguishable here because the interested witness case is one in which it was a single letter that was offered by a family member, whereas here it's not a single letter that's been offered by either Mr. Tinto's sister or Ms. Geraldine, the prison guard and cousin. Both were sworn declarations under penalty of perjury as well as pictures that corroborate the injuries as well as letters from doctors. And I believe that. I'm out of time. Thank you. You still have time for rebuttal. Good morning. Good morning. Mr. Durant. Yes, ma'am. May it please the Court, Ted Durant for the United States. Just for clarification, this record, this recent record, this is three PFRs. At bottom we have an adverse credibility determination. And then the Board denied Petitioner's motion to reopen, which Petitioner briefed as well. And then there was a following one, denial of a motion to reconsider, which the Board rendered recently. And then when given the option whether or not to brief it or not, Petitioner declined to brief that. The Court granted that. But we're going to hear all of that today is what we should do, correct? I'm sorry, ma'am? We should hear all of that today? Well, it's all here. But I would argue that the Board's most recent decision, the denial of the motion to reconsider, Petitioner affirmatively declined not to brief it. And so all those arguments would be waived. The government hasn't had a chance to argue. But if the Court does want to look at it, the Board certainly acted within its discretion when it denied Petitioner's motion to reconsider the motion to reopen. So we can just look at the motion to reopen, though. We don't need to look at the motion to reconsider. No, I would argue that's not properly before the Court because Petitioner never briefed that particular motion. No, they didn't brief the reconsider. We could look at the reopen part that was briefed. Correct. Yes, ma'am. Right. I'm sorry. Is that right? Yes, ma'am, you should. Okay. Yes, Your Honor. Can you answer the question about whether or not if we were to find that reopen was not granted correctly or was not applied correctly, the standard was not correct, do we consider substantial evidence, the first one in your pile there, or do we not reach that? No, you wouldn't reach that. We would or wouldn't? You would not, Your Honor. You would send it back to the Board to determine whether or not, you know, whether they consider the proper standard on the motion to reopen. Can we start there? Well, it's funny, Your Honor. This is unique because we now have a decision subsequent to the denial of the motion to reopen, which is the – You told me I'm not supposed to look at that one, so can we look at the one that we can look at? If they've waived everything in that petition, I've never seen this before. You argued to us that they had waived their reopen argument and therefore we shouldn't consider it at all. Did you make any argument of that? In the second PFR? Which one are we talking about? In anything you filed to us, you know, in a supplemental brief or a 28J or anything that said, you can't consider the motion to reopen. It's been fully briefed because they somehow waived it by not briefing this other reconsideration. I've never argued that. But you've never made that argument until today as you stand here. No, Your Honor. Did you tell them that you were going to argue that out in the hall before you came in today? But I've never seen a case where petitioner has not briefed a petition for review that's part of the – Okay. Well, I don't know whether you have forfeited your right to argue that they can't argue their reopen, but we'll certainly consider these arguments as appropriate if they are appropriate to be considered. Yes, Your Honor. But could you address – I would like to start there. Should we hear the – Wherever you want to start. At the bottom, sir. At the bottom, Your Honor. We have three PFRs, two of which have been briefed. The first one is an adverse credibility determination, a solid adverse credibility determination that is – that there's no way that evidence compels a contrary decision. The first of the seven independent reasons the immigration judge gave was that Mr. Tendo always claimed he had been born in 1984, but there's documents that he put forth in the record that indicate that he wasn't born on that date, that he's older or younger. So it really goes to his identity, and these are official government documents. He has no answer for that. He never briefed it, and I don't believe he even challenged it to the board. Secondly, his visa applications, the visa applications he used to come to the United States, they're inundated with inconsistencies. Namely, he said that he had never been arrested in 2016, and when asked about that inconsistency, he said, well, the elders of my political party advised me not to put in the fact that I'd been arrested in 2014. That, despite the fact that there was a newspaper article that he had been arrested in Uganda that he'd put in the record, so it really makes no sense. A lot of times – you'll see the inconsistencies in his visa applications. He often tries to blame some entity, global trotters, that apparently did the visa application for him, but in the visa application, he checks off each time that he did it himself, and we don't even know if this entity even exists. In addition, in these visa applications, he continues to say that he and his wife lived together, even though his testimony shows that they had a very adverse relationship, but in fact that she was part of this conspiracy to harm him. So what's the truth? He has no answer for it. He said that he was not captured in April, tortured for two months, and then taken to prison without a hearing before a judge. I'm sorry, Your Honor? Is it the government's position that he was not – that it's not true that he was captured in April, tortured for two months, and then taken to a prison without a hearing? That was not part of the adverse credibility determination. That would have been – the judge would have found his story to be overall not true, but there's no – the judge relied on the fact that – IJ's fifth inconsistency that a letter from a remand prison Kampala officer stating that Tindo was admitted to prison in June 2012 conflicted with the claim that he was confined in a safe house and never charged with any offense and never brought before a judge. That is exactly what I was just asking about. That's a finding, Your Honor, that the letter submitted by his friend Prossy said that he went to a remand prison in 2012, June 2012. None of his testimony doesn't reveal that. None of the letters that he submitted indicate that he went to remand prison in 2012, with the exception of this letter from Prossy, his friend. So it throws his whole story into – you don't know what to believe. And I'm not saying that he hasn't been injured. I mean, he is missing two fingers. You know, that can happen a lot of reasons. What's inconsistent about that story? That's what I'm trying to figure out. Because she said that he came to remand prison in 2012 where he was held for three months. His story is that these Black Mambas, this entity, took him to these safe houses and he was only released after his family marshaled some form of, you know, public campaign to get him released. It's two different stories. It's two different stories. And you can see from the record when the court goes through it, it's rather large. Mr. Tindo, while he was— Go ahead. That in the record that he has had some legal issues in Uganda, so who knows why he had these injuries or by whom. But he was always given due process. In fact, in his recent civil case, he was found, you know, the charges were dismissed. But getting back to the other adverse credibility determinations, the immigration judge noted, as did the board, that Mr. Tindo had testified that he had been tortured no less than 20 times in Uganda from 2012 to 2018. And we're not talking about simple slaps. We're talking about you getting fingers chopped off and thrown into a pit with a python. I didn't even know if that was possible, getting shot, all this horrible stuff. And it's routine every time he goes back. So the judge found it implausible that he would continue to go back to Uganda if he was subjected to such harm. And there is case law from a different circuit that holds that as— that supports that that would support an adverse credibility determination. It makes no sense to go back. It seems to me that people with particular zealousness about a cause, I think of Russians who return despite the difficulties they face when they go back, even being poisoned more than once, how can we weigh that kind of credibility? Is the I.J. looking at the immigrant and saying, I don't think this is not that kind of person who would keep braving the dangers? It seems to me some people do. It goes to plausibility, Your Honor. And, again, the standard here is whether or not a contrary result is compelled. And given his described injuries and what he went through, I don't know anyone, I mean, who would go back to something like that routinely. And he was always out of the country. He's in Tanzania. He's going—he stopped in England. He could have—and when he came back to the United States, when he came here in 2014, after— Let me ask you about this imprisonment. It seems to me part of the briefing seems to be emphasizing the difference in terminology, but your oral presentation here seemed to identify a difference actually between— this actually is something to consider that would be called a safe house and is run by outside groups as opposed to the prison that he says he was taken to. Is that part of your adverse credibility determination, that regardless of what he called where he was staying, calling it what he did is really suggesting an entirely different kind of incarceration than being sent to prison? That particular adverse credibility determination, what I'm saying is in the letter from Prossy, she said he came to this remand prison, Kamala, in June 2012. In all his testimony and the letters from his friends and family, they all said unknown location, unknown location, unknown location. Not one of them mentioned remand prison Kamala, which is a known entity that he was eventually released from. And also in his other story is that somehow while he was being held in these safe houses, he was able to marshal friends and family and was able to be released. What do you say he is credible for insofar as not torture in the sense that it's coming from the government, but from injuries inflicted on him? What is he credible about regarding his injuries? He's—well, he has— I just want to see what's left after these efforts of—not effort. I'm not saying there's any particular goal in mind. But after you look at what he's not credible about and the IJA making that decision, is there a core group of things that there really is not any credibility question about? Other than maybe he's missing some body parts that his fingers hear, that he went through a civil action in Uganda. But the judge, the trier of fact, was—he was within his own right to find these adverse credibility determinations. There are seven of them, and I would argue all very—all quite strong, all independently dispositive. And for a petitioner to win the day, at least in that petitioner particular PFR, he has to show that the adverse credibility determination is not supported by substantial evidence, and that's exceptionally high standard. Through this story, there's questions abounding. I can look through here, nothing straight from who he is, when he was born, who he was married to, who tortured him and when. And that's why the immigration judge found him incredible. Now, with respect to his motion to reopen that he filed, Your Honor, this was based allegedly five days or so after the board dismissed his appeal. He claimed his sister was attacked in Uganda. And it was a continuation of—the letter from his sister, it appears contrived. It goes through everything. It says they came in, they were looking for my brother. They mentioned the incident back in 2012. It's nothing but a continuation of the old persecution claim that the immigration judge found incredible. And that's why it's not material. Petitioners—it's a heavy burden. When you file a motion to reopen, it's not just you can file a couple documents and win the day. It's a heavy burden, and it should be, because these immigration cases would go on forever if it were that easy. Did the changed country conditions standard apply, and did—or did the judge incorrectly use that standard? The board did not use an incorrect standard. They cited to—first they cited to Abidu the Supreme Court decision. Then they cited to Coelho, which is another standard on a motion to remand. They recognized that the motion to reopen, and they put it in there, was filed right after the denial of the board's decision. But you can use the board decision that they cited to for the principle that the evidence he submits when he has an adverse credibility determination, it must be material. It must be material. And it's materiality that we have here, and it's the 800-pound gorilla in the room, this adverse credibility determination. If you're going to submit a motion to reopen, does that evidence, is it material to that adverse credibility determination? Does it attack it? Did we have in this motion to reopen, for example, a letter from global trotters, the people that allegedly did his visa application? Yes, we screwed up when we did this visa application. Is there anything in there from remand prison Kamala that says, oh, he was here in—or he wasn't here in 2012? There was nothing, nothing— I think he means he was there. General Dean says he was there. Yes, ma'am. Yes, Your Honor, I'm sorry about that. What I'm saying is, is there anything in his new evidence that undermined the adverse credibility determination? And it isn't. It's two letters from interested parties, his cousin and his sister, and the judge indicated why he found his sister's letter incredible at the first hearing. It's two interested parties who continue on the same claim. It's not a new claim. It's just a rehashing of the old one. Does the FSN standard apply in this context or not? It is—it's for untimely motions to reopen. But the evidence in any case, in any motion to reopen, it must be material. Okay, so does that standard that says—so you're saying it does apply or doesn't apply? It does apply to the extent that it's—they use it as an analogy. There's very few cases. There's very—there's no board cases out there that I could find where someone files a motion to reopen within 14 days, and then they make a decision there. And the board decision cited Quar out of the Second Circuit, and it's really for the principle of if you're going to file a motion to reopen and there's an underlying adverse credibility determination, it must be—the evidence must be material. It must undercut the adverse credibility determination. What do you do with the dissent that says, of course this rehabilitates this credibility, and so it is material? Judge Donovan, I think is his name, says this, of course, is exactly the kind of evidence that would be helpful. With all due respect, Your Honor, I think she's wrong. She's simply wrong. It was a 2-1 decision. I don't know why she felt that this evidence rehabilitated Mr. Tendo. Well, it supports where he was in 2012 at relevant time periods. It clears up a little bit of ambiguity there. What it does, it just—if you look at his sister's declaration, it's just a rehashing of that old claim. It's almost contrived. It does nothing to undermine the adverse credibility determination. Whether it's contrived or not is a different thing. We're trying to say does it help his case. No, Your Honor. And it says—it tells where he was when, which was an issue, and supports his version of it. It's just a continuation of the old claim. It's just as if five days later his sister submits this letter and says they came looking for him again. They mentioned it. They said they were police officers, and then they brought up the 2-12 decision or the alleged 2-12 beating. But it does nothing to address the seven reasons, the agency and an immigration judge. Well, one of those seven reasons was directly about the 2-12 timeline. But it just went to the fact that they're just alleging that they torched him there. It has nothing to do with whether or not he—the visa applications were somehow not inconsistent or that his wife, who he testified was adverse and against him and helped put him in jail, actually did live with him during the time period that he says that she was against him. It doesn't undercut the adverse credibility determination. And there's case law out there, and it seems to be supported by this Court in an unpublished decision that I cited, that if you're going to file a motion to reopen and you have an underlying adverse credibility determination, the evidence you put forth better be very persuasive and better do something to address that adverse credibility determination. And here you don't. You have two interested witnesses. And when the Board denied the motion to reopen, independently it said, you know, notwithstanding the fact that he hasn't addressed the adverse credibility determination, what you have are his sister and his cousin who's helped him all along submitting these letters, and they haven't been subject to cross-examination, and of course they're not going to be given any weight. And that's independent of the fact that he never sought to introduce this adverse credibility determination that's there, that's this monstrosity in the room that he will dance around. I mean, it can't be that easy. It is an incredibly high burden on a motion to reopen. What about the direct evidence that Ugandan officials are actively searching for him in Uganda? From whom, Your Honor? Is that from the declaration of prosecution or from the sister? Geraldine stated that she learned from a fellow Ugandan official the idea that they're actively looking for him and that they will arrest him and treat him as a terrorist. That's just a continuation of Mr. Tendo's claim that if he goes back, you know, they're going to hurt him. It's based on his life in ELOI ministries. It's just a continuation. But it's new from someone else who said that the Ugandan government said it. A government official said it after all of this. I mean, when Prossi allegedly went to Entebbe Airport and someone told her this, it's new statements that the government is looking for Petitioner, but it's the continuation of the old claim. It's not as if you're being persecuted by some other entity other than the government. The government is still coming after me. Is it our government's position that the Ugandan government is not coming after him? Not based on this record. There's no credible evidence that his story is so riddled with inconsistencies, Your Honor. Well, it's forward-looking evidence rather than backward-looking evidence. It's not looking back at what happened in 2012. It's saying currently or whenever this actually happened. It's been a while now. But it was forward-looking from the time that they are actively looking for him. Why isn't that different evidence that usually in this case people say, oh, I'm going to be harmed, and the problem is that they have in the past only they didn't get help from the police or something when some third-party drug dealer or somebody hurt them. And I'm not minimizing that. But this is actually saying the government itself says they're still on the lookout and they believe he's a terrorist and he's wanted. And we do know that they had these regime changes in Uganda and that these people have been going back and forth in these really hotly disputed situations. I mean, this is historically based about these groups in Uganda. In this case, Your Honor, the evidence came from two interested parties, a sister and a cousin, who reiterated that he'd been harmed in the past and that they're still looking for him. It was similar to his testimony at his hearing. It's not new. It's not that there's a new entity looking for him. It's like Uganda wants to hurt him again, just like they did 20 times. They said he's gone back there 20 times. They've not forgotten about him. They're going to get him when he comes back. Assuming the story is true, but the immigration judge found his story of persecution not credible based on very solid reasons. There's nothing that compels it. It is riddled with inconsistencies from whether or not he was even where he was persecuted in 2012 to whether or not he can be candid on anything. I think our time is expiring. We need to wrap it up. Did you have anything else that you want to say? No, Your Honor. I just want to thank the court. At bottom, we have two agency decisions here. Substantial evidence supports the adverse credibility determination, and Petitioner has not met his heavy burden of showing that he warrants or should be granted a motion to reopen. Thank you. Thank you. May it please the court. I'd like to start off with the motion to reopen that was adjudicated a pursuant to the wrong standard. So as we just, in the government's argument that their reliance upon FSN provides two different bases. Either A, you need to overcome the prior adverse credibility finding, or B, you need to provide a new factual basis. The government would like to believe or is proffering the argument that there is no new factual basis. However, that's like objectively incorrect on two bases. One, in asylum law, you can either receive asylum based upon past persecution or B, a well-founded fear of future persecution. So anything that was prior to the evidence that was proffered or provided in that motion to reopen would have been germane to the past persecution claim. However, the instance of his sister being targeted, abused in her own home is not an indicia of past persecution, but rather is an indicia of well-founded fear of future persecution. What if they say, well, he wasn't past, because he wasn't really, he's lying about the past, then we take with a grain of salt what these people are saying about the future. I don't know that you necessarily have to, at least FSN, the case doesn't combine the two. It treats it as one or the other. And so that these are new facts that are independent of the prior adverse credibility finding. They are not subject to that adverse credibility issue, even though this conversation, as we're speaking to FSN, it is not necessarily what the law requires as it's a timely motion to reopen that's not required to reach this changed country conditions exception that FSN seeks to articulate. And so this court actually, and Paul V. Gonzalez and Edward V. Ashcroft specifically identified that there is a distinction between the past persecution and well-founded fear of future persecution. And so the motion to reopen was predicated on an independent set of facts based upon a new ground for relief. Well, you've drawn some fine lines, it seems to me, Counselor. It seems to me the basic point by your friend on the other side is that there's a story, and there's a new chapter in it, which is very much tied to what's happened before, and the new chapter is his sister has had these events happen to him, and there's a report that he will be, they're after him if he returns. But that really doesn't hold together unless you undermine the credibility about the whole foundation for that. Now, I understand the case law that you're talking about, but it does seem to me that credibility still is front and center in what has been proposed. And one of the things, again, DOJ counsel said is FSN may not be directly on point. It's not a motion to reopen in this case that quite fits FSN, but nonetheless, those principles are still relevant in trying to figure out how to deal with this. Is there anything to respond to in there? Yes, so the response being that the new arguments that the precision with which the sister was attacked immediately upon this awareness of a final order here in the United States demonstrates that there is a renewed interest. And so while the prior application would be brought based upon past persecution to him as an individual, well now if we're thinking about asylum law where you have persecution on account of a protected ground, this is no longer singularly to the persecution to Mr. Tendo, but rather it's Mr. Tendo as a group within his family. So it's an independent ground that wasn't previously proffered. Then the other aspect with respect to, I guess we can go back to the basis for the adverse credibility finding. I'd just kind of like to rehash really quickly the government posture or position about his identity being at issue. His identity is not at issue. This case is a seminal case of Wayne V. Holder found that the most significant point was that the identity of the petitioner. In that case, the identity could not be established. That is not the case here. His identity is firmly established. The issue is what is his birthday. And the birthday issue is every formal document issued, whether it's his birth certificate, his national ID card, or otherwise, directly from the Ugandan government, all contain the correct birthday of November 24th, 1984. His twin sister resident ID card also has 1984. The only discrepancy comes from one, prison records, to a school, both of which those, I guess, the first prong of FSN rehabilitating the adverse credibility finding were provided to explain away those two components. And I'm out of time unless you have any other questions for me. Did you waive your claim on the reopening because you didn't do the reconsideration brief? I'm sorry. Did you waive the claim on the reopening because you didn't respond to the denial of the reconsideration, which is what they began their argument with in the other side? No. So the reconsideration was in order to exhaust administrative remedies such that the motion to reopen was still properly before this court. Okay. Thank you. We have your arguments. We appreciate the arguments in this case. The court's going to take a 10-minute break before considering the final case for the day. Thank you. Thank you. All rise. Thank you.